Leslie **MAUDSLEY**, Appellant,

v.

Jonathan E. **PEDERSON**,
**M.D., Respondent.**

No. A03–915.

Court of Appeals of Minnesota.

March 16, 2004.

Judith L. Emmings, John W. Carey, Sieben, Grose, Von Holtum, & Carey, Ltd., Fairfax, MN, for appellant.

William M. Hart, Cecilie Morris Loidolt, Damon L. Highly, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondent.

Considered and decided by ANDERSON, Presiding Judge; STONEBURNER, Judge; and HUDSON, Judge.

## OPINION

HUDSON, Judge.

Appellant challenges the district court's dismissal of her medical-malpractice claim against respondent. Appellant contends that respondent's 15– to 17–hour delay in diagnosing and treating her eye infection caused her to lose vision in one eye. Respondent moved to dismiss the action pursuant to Minn.Stat. § 145.682 (2002), contending that appellant's expert affidavit failed to detail a chain of causation. Appellant contested the motion, arguing that respondent's motion was untimely under Minn. R. Gen Pract. 115.03 and the court's scheduling order and that the expert affidavit was substantively sufficient under Minn.Stat. § 145.682. The district court determined that it had the authority to hear the untimely motion and dismissed the case, finding that appellant's expert affidavit failed to meet the substantive requirements of Minn.Stat. § 145.682 and Minn. R. Evid. 702. We affirm.

## FACTS

In the spring of 1999, appellant Leslie Maudsley suffered from advanced glaucoma, which caused her to experience impaired vision in both eyes. In April 1999, Maudsley sought treatment from respondent Jonathan E. Pederson, M.D. Peder-

son determined that glaucoma surgery (trabeculectomy) was necessary on both of Maudsley's eyes to help prevent future vision loss. Trabeculectomy carries the risk of several complications, including the infection streptococcal endophthalmitis. It is undisputed that streptococcal endophthalmitis is an extremely virulent infection. Indicia of this infection are redness, swelling, pain, mattering or discharge, as well as decreased vision.

On May 27, 1999, Pederson performed surgery on Maudsley's left eye; she experienced no complications from the surgery. On June 17, 1999, Pederson performed surgery on Maudsley's right eye. Maudsley was scheduled for a post-operative check-up appointment on the morning of June 28. Ten days after the surgery, on June 27, 2002, Maudsley called Pederson complaining of problems with her right eye. Maudsley and Pederson agree that Maudsley told Pederson she was experiencing pain and seeing black dots—symptoms consistent with mild and normal post-operative bleeding. But the parties dispute whether Maudsley also told Pederson she was experiencing "intense pain" and an eye "hemorrhage"—symptoms consistent with infection.

Claiming that he believed Maudsley had normal post-operative symptoms, Pederson advised Maudsley to wait and see him at her scheduled appointment the next morning, 15–17 hours later. When she attended her appointment the next morning, Pederson diagnosed the right eye as infected and sent her to a vitreoretinal specialist, who identified the infection as streptococcal endophthalmitis. Maudsley ultimately lost all vision in her right eye. Maudsley claims that the 15- to 17–hour delay in diagnosis caused her vision loss.

Maudsley filed a complaint on May 8, 2001, claiming medical malpractice. On May 31, 2002, Maudsley submitted Dr.

Harvey Rosenblum's expert affidavit. Dr. Rosenblum's affidavit gave the following statement on causation:

It is more likely than not that if treatment had been initiated on June 27, rather than June 28, Leslie Maudsley would not have lost the vision in her right eye. She may have suffered some impairment to that vision, but she would not have lost it totally. When infections are present, it is generally true that better outcomes are the result of earlier treatment; in fact every hour counts.

After receiving Dr. Rosenblum's affidavit, Pederson requested that Maudsley supplement the affidavit because it lacked specific information regarding causation. On June 27, 2002, Maudsley submitted an amended affidavit, which added the following sentence: "It is more likely then [sic] not that if treatment had been initiated on June 27, 1999, that Leslie Maudsley would have recovered from the infection and had the vision she had at the time surgery was performed on June 17, 1999."

On August 8, 2002, Pederson sent Maudsley a second letter stating that the amended affidavit suffered from the same deficiency regarding causation. Seven months later, in March 2003, Pederson brought a motion, identified as a "motion in limine," to strike Maudsley's expert affidavit as inadequate and to dismiss Maudsley's claim with prejudice pursuant to Minn.Stat. § 145.682. Pederson served notice of the motion via a letter on March 27, 2003, and served motion papers on March 31, 2003. The motion was set for hearing on April 9, 2003, the scheduled date of the pretrial conference.

Maudsley filed a response to the motion on April 7, 2003, claiming that the motion was a dispositive motion and untimely under Minn. R. Gen. Pract. 115.03 and the court's scheduling order. Maudsley also argued that the affidavit was substantively

adequate under Minn.Stat. § 145.682. The court heard arguments on the motion on April 9, 2003. At the close of the hearing, the court requested that each side submit proposed findings of facts, conclusion of law, and order for judgment by April 16, 2003. On April 10, 2003, the judge's law clerk contacted Maudsley's attorney to inform her that the court was dismissing Maudsley's case. Maudsley's counsel sent a letter to the court asserting that Maudsley had been deprived of an opportunity to respond to "new arguments raised by our opposing attorneys, or to respond to cases provided to the court at the pretrial conference." The judge's clerk again contacted Maudsley's attorney and gave her an opportunity to submit proposed findings of fact, conclusions of law, and order. Maudsley's attorney declined to submit anything further to the district court. The district court dismissed the case on May 13, 2003. This appeal follows.

## ISSUES

I. Did the district court err by hearing Pederson's motion to dismiss pursuant to Minn.Stat. § 145.682 when Pederson failed to comply with the formal notice requirements for filing a dispositive motion?

II. Did the district court abuse its discretion by granting Pederson's motion to dismiss pursuant to Minn.Stat. § 145.682?

## ANALYSIS

### I

Maudsley argues that the district court erred by granting Pederson's motion for dismissal pursuant to Minn.Stat. § 145.682 (2002) because it was untimely under Minn. R. Gen. Pract. 115.03 and the district court's scheduling order. Minn. R.

Gen. Pract. 115.03 requires that a party file dispositive motions 28 days prior to the hearing; the district court's scheduling order required that dispositive motions be heard at least ten days prior to the pretrial/settlement conference.

■ Under Minnesota law, a plaintiff who brings a medical-malpractice claim must file an affidavit that identifies (1) qualified experts who intend to testify; (2) the substance of their testimony; and (3) a summary of the basis for the experts' opinions. Minn.Stat. § 145.682, subd. 4(a). Failure to comply with the affidavit requirements mandates that the district court, upon motion, dismiss the plaintiff's claim with prejudice. Id., subd. 6; *Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 577 (Minn.1999). Absent an abuse of discretion, we will not reverse a district court's dismissal of a suit pursuant to Minn.Stat. § 145.682. *Anderson v. Rengachary*, 608 N.W.2d 843, 846 (Minn.2000).

■ The district court acknowledged that Pederson's motion was untimely, but relying on *Lombardo v. Seydow–Weber*, 529 N.W.2d 702, 705 (Minn.App.1995), *review denied* (Minn. Apr. 27, 1995), concluded that it had the authority to dismiss Maudsley's claim on the merits because the mandatory dismissal of malpractice claims regulates substantive rights, which cannot be abridged, enlarged, or modified by procedural rules. The district court held that Maudsley could not use the General Rules of Practice or the scheduling order to avoid the requirements of Minn. Stat. § 145.682. The district court concluded that by failing to adequately address causation, Maudsley's expert affidavit did not meet the requirements of Minn.Stat. § 145.682, and her claim was thereby subject to mandatory dismissal.[1] We see no

1. On May 23, 2002, Minn.Stat. § 145.682, subd. 6, was amended and now gives a plain-

tiff 45 days to amend an allegedly defective

abuse of discretion in the district court's ruling.

■ Here, both parties and the district court acknowledge that although the motion was labeled as a "motion in limine," it was, in fact, a dispositive motion to dismiss, and it did not comply with the notice requirements of either Minn. R. Gen. Pract. 115.03 or the court's pretrial/settlement conference order. But nothing in Minn.Stat. § 145.682 prevents the district court from hearing an untimely motion. And whether or not to enforce its own scheduling order is clearly within the district court's discretion. Moreover, in the comments to Minn. R. Gen. Pract. 115, the advisory task force explained that "[t]he time limits of [the rules of general practice] may be readily modified by the court." Minn. R. Gen. Pract. 115.03, 1997 advisory comm. note. Accordingly, we conclude that the district court did not err by hearing Pederson's motion to dismiss.

■ We are concerned, however, about the timing of Pederson's motion. We recognize that Minn.Stat. § 145.682 does not prescribe time limits within which motions to dismiss must be brought. But the primary purpose of the statute is to eliminate nuisance malpractice suits. *Oslund v. United States,* 701 F.Supp. 710, 713 (D.Minn.1988); *Parker v. O'Phelan,* 414 N.W.2d 534, 537 (Minn.App.1987), *aff'd,* 428 N.W.2d 361 (Minn.1988). Thus, the statute is designed to encourage parties to bring motions to dismiss early in the proceedings in order either to eliminate frivolous lawsuits or to give the plaintiff an opportunity to cure any defects prior to trial. Here, Pederson argues that by sending Maudsley two letters in June and August of 2002 asking her to supplement her expert affidavit, he gave Maudsley ample notice that he intended to challenge her expert affidavit, particularly since the June 17 letter indicated that Pederson would bring a motion to dismiss pursuant to Minn.Stat. § 145.682 if the affidavit was not supplemented with respect to causation. Maudsley did supplement the affidavit, but Pederson still maintained that it was inadequate. The trial was set for May 19, 2003, but Pederson did not move to dismiss the action until the pretrial conference on April 9, 2003. By not moving to dismiss the action earlier, Pederson lulled Maudsley into thinking they were going to trial, despite counsel's letters pointing out weaknesses in the affidavit's chain of causation. The purpose of the statute is to get rid of frivolous cases early; not to surprise plaintiffs on the eve of trial with a motion to dismiss the case. We strongly urge parties to bring these motions in a timely fashion.

## II

■ Maudsley also contends that the district court erred by dismissing her case because her expert affidavit is substantively sufficient under Minn.Stat. § 145.682. The district court found that Maudsley's expert affidavit failed to: (1) provide the specific details concerning the expert's expected testimony as required by Minn. Stat. § 145.682; and (2) provide a causal link between Maudsley's loss of vision and the defendant's alleged delay in diagnosing streptococcal endophthalmitis.

Minn.Stat. § 145.682 was enacted by the legislature to eliminate frivolous medical-negligence lawsuits by requiring that plaintiffs file affidavits verifying that their alleged claims are well founded. *Stroud v. Hennepin County Med. Ctr.,* 556 N.W.2d 552, 555 (Minn.1996). The supreme court has set forth a strict standard for complying with the "clause 2" affidavit (of expert affidavit in order to avoid mandatory dismissal.

identification) required under Minn.Stat. § 145.682:

> In cases commencing after this opinion is filed ... we will expect a more complete disclosure.... [P]laintiffs will be expected to set forth, by affidavit or answers to interrogatories, specific details concerning their experts' expected testimony, including the applicable standard of care, the acts or omissions that plaintiffs allege violated the standard of care and an outline of the chain of causation that allegedly resulted in damage to them.

*Lindberg,* 599 N.W.2d at 576 (quoting *Sorenson v. St. Paul Ramsey Med. Ctr.,* 457 N.W.2d 188, 193 (Minn.1990)); *see also Teffeteller v. Univ. of Minn.,* 645 N.W.2d 420, 428 (Minn.2002); *Stroud,* 556 N.W.2d at 555–56.

Maudsley argues that her expert affidavit contained sufficient details as to causation and was similar to the expert trial testimony admitted at trial in two cases. *See Demgen v. Fairview Hosp.,* 621 N.W.2d 259, 263 (Minn.App.2001), *review denied* (Minn. Apr. 17, 2001); *Blatz v. Allina Health Sys.,* 622 N.W.2d 376, 386–87 (Minn.App.2001). We disagree. The expert testimony in *Blatz* and *Demgen* is distinguishable from Maudsley's expert affidavit, because the expert testimony in both of those cases included a greater level of specificity on causation. For example, in *Demgen,* the expert affidavit stated:

> c. Had the ultrasound test been performed, it would have revealed abnormally low amniotic fluid levels (i.e., the presence of Oligohydramnios). In combination with the markedly abnormal fetal heart rate tracing, this finding would dictate the need for an immediate caesarean section.
>
> d. In a hospital comparable to that at issue, the applicable standard of care would dictate that such an emergency caesarean section be accomplished within 53 minutes, prior to this fetus dying. The failure to have the appropriate tests completed delayed having a caesarean section performed. Failing to have the appropriate tests completed was a direct cause of the fetus' death....
>
> e. Had such an emergency caesarean section been timely performed, a live birth would have resulted.

621 N.W.2d at 263. Further, the expert in *Blatz* testified:

> (a) the paramedics played a substantial part in [Blatz's] brain injury * * * because of the delay; (b) [e]very second is critical because the brain, when deprived of oxygen, is extremely sensitive; (c) there's only a certain window within which the brain must be reperfused and reoxygenated or irreversible damage will occur; (d) the period for which the brain can be without oxygen before permanent damage occurs is five minutes; (e) if persons are resuscitated within the five-minute window, the outcome is [u]sually good, without any perceptible irreversible brain damage; and (f) the longer * * * outside [the] 5–minute window resuscitation occurs, the more irreversible brain damage occurs.

622 N.W.2d at 386–87 (quotations omitted).

Here, Maudsley's affidavit contained the following language:

> **Causation.** ...
>
> It is more likely than not that if treatment had been initiated on June 27, rather than June 28, Leslie Maudsley would not have lost the vision in her right eye. She may have suffered some impairment to that vision, but she would not have lost it totally. When infections are present it is generally the rule that better outcomes are the result of earlier treatment; in fact every hour counts. It is more likely then not that if treatment

had been initiated on June 27, 1999 that Leslie Maudsley would have recovered from the infection and had the vision she had at the time surgery was performed on June 17, 1999.

■ Compared with the detailed affidavits in *Blatz* and *Demgen*, the general statements in Maudsley's affidavit are not sufficient to satisfy the strict standard for expert affidavits. The primary purpose of an expert affidavit is to illustrate "how" and "why" the alleged malpractice caused the injury. *Teffeteller*, 645 N.W.2d at 429 n. 4. Such detail was particularly important here, where Pederson claimed that early treatment does not typically affect the poor prognosis associated with this virulent infection. The conclusory statements that generally earlier treatment results in better outcomes and that every hour counts fail to outline specific details explaining how and why Pederson's 15– to 17–hour delay in treatment caused Maudsley's blindness. As the district court correctly noted, a delay in diagnosis is not enough; if it were, expert testimony on causation would not be necessary. *See, e.g., Leubner v. Sterner*, 493 N.W.2d 119, 122 (Minn.1992) (holding that something more than conclusion that delay in diagnosis "invariably results in a more serious prognosis" is needed to make out a prima facie case). Therefore, we conclude that the district court did not abuse its discretion by dismissing the case.

Because our analysis of this issue is dispositive, we do not reach whether the district court erred by excluding Maudsley's expert under Minn. R. Evid. 702.

## DECISION

We affirm the district court's decision to dismiss Maudsley's case and conclude that the district court did not err by hearing Pederson's motion to dismiss under Minn. Stat. § 145.682. Further, because Maudsley's expert affidavit failed to set forth a detailed chain of causation explaining how and why Pederson's delay in treatment resulted in Maudsley's loss of vision, the district court did not abuse its discretion by dismissing Maudsley's case with prejudice. We encourage parties to bring motions to dismiss early in the proceedings so that these cases may be resolved expeditiously.

**Affirmed.**